**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GET BACK UP, INC.,

      Plaintiff,

v.                              Case No. 11-13909

CITY OF DETROIT, et al.,

      Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS',**
**AND DENYING PLAINTIFF'S, MOTION FOR JUDGMENT**

Get Back Up ("GBU"), a substance-abuse treatment center, sought from the
City of Detroit a permit to operate in one of the city's business zones. The city, acting
through its board of zoning appeals ("BZA"), denied GBU a permit. Asserting both that
Detroit thereby violated the Americans with Disabilities Act ("ADA"), the Fair Housing
Act ("FHA"), and the Rehabilitation Act (together, "federal discrimination law") and that
the pertinent zoning ordinance is void for vagueness, GBU sues Detroit and the BZA
(together, "Detroit" or "the city").[1] GBU seeks a declaratory judgment and an injunction
blocking enforcement of the permit denial. Detroit has agreed to allow GBU to operate
pending the district court's resolution of the action.

---

[1] Usually a municipal board is subject to suit "only if the law creating [it]
recognizes [it] as [a] separate legal entit[y]" with the "capacity to sue or be sued." 4
Moore's Federal Practice § 17.26 [3] (2013). GBU has not established that the BZA can
be sued. The BZA will remain in the action, however, because Detroit raises no
objection to its presence.

Both sides moved for judgment, and the court conducted a hearing.  Because its claims fail on the merits, GBU may not receive a declaration or an injunction.  GBU's motion will be denied, and Detroit's will be granted.

## I.  BACKGROUND

In Michigan, as in each other state, "a local unit of government may provide by zoning ordinance for the regulation of land development . . . to promote public health, safety, and welfare."  Mich. Comp. Laws § 125.3201(1); *see Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926).  In Detroit, as in most other cities, a municipal ordinance divides land into a variety of residential, business, industrial, and special zones.  This action involves Detroit's B–4 zone, a "General Business District," for "thoroughfare-oriented" businesses, in which a car park or a health club, a gallery or a mortuary, a cabaret or a cobbler's, may, among many other trades and services, open and operate as of right.  Detroit, MI, Zoning Ordinance Sec. 61-9-71 (2006).  Among other establishments that may, also, use a B–4 zone as of right are five atypical forms of residence—most pertinently, a nursing home—and several forms of "public use," such as a hospital.  On a "conditional" basis, still other residential uses are allowed; specifically:

(1)  Emergency shelter . . .

(2)  Fraternity or sorority house

(3)  Loft, outside the Central Business District [one of the city's other zones]

(4)  Multiple-family dwelling

(5)  Pre-release adjustment center . . .

(6)  Residential substance-abuse service facility

2

    (7)  Residential use combined in structures with permitted commercial uses

    (8)  Rooming house

    (9)  Single-family detached dwelling

    (10)  Single-room-occupancy housing, nonprofit

    (11)  Town house

    (12)  Two-family dwelling

Sec. 61-9-80.  The pertinent "condition" is the issuance by the city of a conditional-use permit.  An applicant seeking a permit must present itself in a public hearing, Sec. 61-3-214, and address fifteen permit criteria, which range from specific directives, such as, "Adequate utilities, access roads, [and] drainage . . . have been or will be provided," to general standards, such as, "The Conditional Use will not be injurious to the use and enjoyment of other property in the immediate vicinity[,]" or, "The Conditional Use is so designed, located, planned, and to be operated so that the public health, safety, and welfare will be protected," Sec. 61-3-231.  An applicant must show that the proposed use satisfies each criterion, a task simplified slightly by statutory redundancy.

    GBU bought an abandoned school building in a B–4 zone and, intending to use the building as a "residential substance-abuse service facility," applied for a conditional-use permit.  The public hearing that followed was, according to the zoning board, "the most difficult and contentious . . . [in] memory"; "angry verbal outbursts were common"; but, "despite allegations of 'disrespect' from both sides, the hearing was . . . completed," and the board granted GBU a permit.  (Dkt. # 1, Ex. A.)  A local homeowners' association appealed to the BZA, which conducted a hearing and reversed the lower board.  The dispute then journeyed to the county court, back to the BZA for a second

3

hearing, and, after the BZA again reversed, back to the county court, up to the state court of appeals and the state supreme court, and, finally, to this court.  The magistrate judge issued an order holding that none of the earlier proceedings preclude a federal action.  (Dkt. # 18.)  At present GBU challenges (along with the governing ordinance) the BZA's second hearing and second ruling, which emerge from the tortuous procedural history and become the focus of attention.

GBU's second hearing before the BZA occurred on December 8, 2009.  During the hearing the BZA heard from, among others, counsel for GBU, the president and CEO of GBU, counsel for the local housing association, and several members of the public.  (Dkt. # 10, Ex. D.)

GBU's counsel called GBU "a model residential drug treatment program"; he said that GBU surveils its premises at all hours and that each resident remains almost constantly occupied.  He said that the abandoned building had, before GBU's arrival, attracted drug dealers and prostitutes; he noted that adjacent establishments enjoy the extra security watch which GBU provides; he asserted, on the authority of general studies, that GBU would not bring crime to the surrounding neighborhood.  He said that "the people who come to [GBU] are not sentenced" to do so; that they "voluntarily check themselves in . . . because they have the desire to free themselves from the ravages of drug addiction."  He acknowledged, however, that GBU might agree to treat addicts sent directly from prison.

Dr. William Taylor, GBU's president and CEO, stated that as a former addict himself, he "know[s] the value of changing lives."  He said that GBU was at that moment housing around thirty men, and planned eventually to house one hundred sixty.  He said

4

that each resident must complete sixty days of treatment (now thirty) before he may receive a pass to leave the building, and that each visitor must pass through a metal detector.  He noted that GBU provides "rigorous therapy," including for relapse prevention, anger management, and issues of domestic violence.

Counsel for the local housing association observed that GBU, although in a business zone, abuts on one side the single-family homes of a residential area.  He introduced an employee of a nearby drugstore, who testified that a man claiming to live at "the rehab down the street" had been caught with stolen merchandise and a long knife.  The employee said the man was one of two recent shoplifters to claim residence at a nearby "rehab," although he added on cross-examination that the store catches a thief almost daily.  The association's counsel then recited the letter of a local woman, who reported that GBU's residents hector passing pedestrians; that they blow kisses and pound the windows.  The association's president, speaking later, said he had received other, similar complaints.  If this is the mischief of thirty men, counsel asked, what is the fruit of a hundred sixty?

A procession of citizens spoke in opposition to GBU.  They invoked their fear for their safety and the value of their property; they alleged that Dr. Taylor had only lately become candid about his plan to house recovering addicts; they noted a new local phenomenon—strange men approaching front porches and asking for a job; and they worried about residents quitting the voluntary program, leaving the building at will, and roaming the neighborhood.

One of the BZA members acknowledged that Detroit badly needs programs such as GBU's; the pertinent issue, he and other board members said, was location.  When a

5

board member asked him to address the residents' alleged misbehavior, GBU's counsel digressed; he discussed the building's security and the general need for drug rehabilitation, and he questioned the rationality of the concerned portion of the public, but he elided the citizenry's specific allegations; his answer was, to the board, dissatisfactory.  At the close of the hearing a member moved to reverse the grant of a permit.  He listed his grounds; the proximity of a residential neighborhood, the harassment of pedestrians, the attendant risk to home value.  The motion carried.  The BZA on March 10, 2010, issued detailed findings of fact and summary conclusions of law against GBU.  (Dkt. # 10, Ex. V.)

Thus the hearing and the ruling, as yet unenforced.  A year later GBU agreed to provide a forty-five day program for men who violate a term of probation, (Dkt. # 10, Ex. C); it began, that is, to house men "mandated to enter [GBU] by a court," (Dkt. # 10 at 8).  It appears to have agreed also to house prisoners and parolees.  (Dkt. # 10, Ex. DD.)  The state's department of corrections severed all ties, however, when it learned that GBU lacks a zoning permit.  (*Id.*)

## II.  STANDARD

Rule 12(c) allows a party to establish, based on the pleadings alone, the party's entitlement, by law and uncontested fact, to a judgment.  *J.P. Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581-82 (6th Cir. 2007).  "On the pleadings alone" is not quite accurate; an exhibit or a public record may be considered if the complaint mentions it and it is central to the dispute.  510 F.3d at 582.  This action demands for its resolution no more than a careful review of, first, the standard legal resources and, second, the record of the key event in the complaint, GBU's appeal to the BZA.  The parties were

6

accordingly directed to stipulate to a set of material facts and submit cross-motions for

judgment.  (Dkt. # 19.)  The parties continue to contest many of the facts in their

"stipulation," in large part because GBU proposed and adhered to a statement of facts

that resembles an opening argument; each pertinent disagreement arises from GBU's

blending commentary into the recital of the proceedings before the BZA.  GBU may, in

opposing a motion for judgment, claim each reasonable inference in its favor; but it may

not contradict the record.  *See Commercial Money Ctr., Inc. v. Ill. Un. Ins. Co.*, 508 F.3d

327, 336 (6th Cir. 2007); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir.

2011).  After each contradiction between GBU's facts and the BZA record is resolved in

favor of the record, no material dispute of fact remains, and the action can be resolved

under Rule 12(c).[2]

## III.  DISCUSSION

### A.  Federal Discrimination Law

GBU, employing a common practice, treats the FHA, ADA, and Rehabilitation Act

claims as interchangeable.  *See*, *e.g.*, *Forest City Daly Housing, Inc. v. N. Hempstead*,

175 F.3d 144, 151 (2d Cir. 1999).  The FHA outlaws the "den[ial of] a dwelling to any

buyer or renter because of a handicap," 42 U.S.C. § 3604(f)(1); the ADA and the

---

[2] Papers peripheral to the complaint may inform the resolution of a Rule 12(c) motion only if the district court, shifting from Rule 12(c) to Rule 56, ensures that each party receives "a reasonable opportunity to present all material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  This action, a dispute of law and a review of an agency decision, needs no further development; each party enjoyed an opportunity to submit evidence in accord with an arranged briefing schedule.  And the array of peripheral evidence submitted needs no separate attention, precisely because it, like the central BZA evidence, reveals no material dispute of fact.  The result under Rule 12(c) and under Rule 56 is, in this instance, the same.

Rehabilitation Act contain similar though more general prohibitions, 42 U.S.C. 12131; 29 U.S.C. § 794(a). Detroit concedes that GBU's residents qualify as handicapped or disabled, and GBU has standing to sue. *See MX Group, Inc. v. Covington*, 293 F.3d 326, 335 (6th Cir. 2002). GBU contends that the zoning ordinance violates federal discrimination law by disadvantaging without cause recovering substance abusers, and that Detroit violated federal discrimination law by applying the ordinance to GBU in a discriminatory fashion.

### 1. The Zoning Ordinance

If a zoning ordinance discriminates on its face against the disabled, the defendant must establish that the discriminatory burden the ordinance imposes is "warranted by the unique and specific needs and abilities" of the disabled people the ordinance affects. *Larkin v. Mich. Dept. of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996). To discriminate is to treat materially similar groups differently. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 614 (1999) (Kennedy, J., concurring).

What, in the context of zoning, makes two groups materially similar? The question arises less often than one might think. It does not arise if a zoning ordinance places a burden uniquely on the disabled; singling them out is undoubtedly discriminatory, *see Larkin*, 89 F.3d at 289-90; and it does not arise merely because an ordinance mentions a disabled group. It arises when an ordinance advantages a group as compared to both a disabled group *and others*.[3]

---

[3] During the hearing before the district court, GBU argued that Detroit's zoning ordinance is subject to "heightened scrutiny" because it "isolates"—lists explicitly—a

substance-abuse treatment center.  GBU appears to conflate the "levels of scrutiny" analysis under the equal protection clause with the analysis under federal discrimination law of a facially discriminatory statute.  A law regulating the disabled is not subject to heightened scrutiny, *Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001); *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442-43 & n.10 (1985); and, in any event, GBU does not raise an equal-protection challenge.

Or perhaps GBU means to claim that an ordinance discriminates on its face if it explicitly identifies and regulates a substance-abuse treatment center.  No authority for such a broad claim appears.  Although it floods the record with citation, GBU cites cases that addressed either an as-applied challenge to an ordinance, or an ordinance that placed a unique burden on a protected group.  See:

*MX Group, Inc. v. Covington*, 293 F.3d 326, 345 (6th Cir. 2002) ("The *blanket prohibition* of all methadone clinics *from the entire city* is discriminatory on its face." (emphasis added).); *Larkin*, 89 F.3d at 289 ("By their very terms, these statutes apply *only to . . . facilities which will house the disabled*, and not to other living arrangements." (emphasis added)); *New Directions Treatment Servs. v. Reading*, 490 F.3d 293, 304-05 (3d Cir. 2007) ("[The statute] facially singles out methadone clinics . . . for different treatment"—a unique spacing requirement—"thereby rendering the statute facially discriminatory."); *Bay Area Addiction Research & Treatment, Inc. v. Antioch*, 179 F.3d 725 (9th Cir. 1999) (same); *Cmty. House, Inc. v. Boise*, 490 F.3d 1041, 1049 (9th Cir. 2007) (discussing a unique burden placed on women); *id.* at 1053 ("With regard to the disabled, the City's policies . . . are not facially discriminatory[.]"); *Innovative Health Sys., Inc. v. White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) (addressing an as-applied challenge to a zoning decision); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1494 n.1, 1500 (10th Cir. 1995) ("The Act and the ordinance facially single out the handicapped and apply different"—and unique—"rules to them."); *Human Res. Research & Mgmt. Group, Inc. v. Suffolk*, 687 F.Supp.2d 237, 254 (E.D.N.Y. 2010) ("It is undisputed that [the ordinance] is discriminatory on its face, in that it imposes restrictions and limitations solely upon a class of disabled individuals[.]"); *Habit Mgmt., Inc. v. Lynn*, 235 F.Supp.2d 28, 28 (D. Mass. 2002) ("The zoning ordinance . . . effectively precludes any methadone clinics in the city[.]"); *Hispanic Counseling Ctr., Inc. v. Hempstead*, 237 F.Supp.2d 284, 293 (E.D.N.Y. 2002) ("The defendants, through their Village Code, ban all clinics and substance abuse treatment centers within the Village."); *Potomac Group Home Corp. v. Montgomery Cnty., MD.*, 823 F.Supp. 1285, 1289 (D. Md. 1993) ("No other County law or regulation imposes any similar requirement"—a unique notification requirement—"on a residence to be occupied by adult persons who do not have disabilities."); *Stewart B. McKinney Found., Inc. v. Fairfield*, 790 F.Supp. 1197, 1211-16 (D. Conn. 1992) (addressing an as-applied challenge).

Imagine, for example, a zoning ordinance with the following special zone:

**G–1 GOLF DISTRICT**

**Description:**

The G–1 Golf District is devoted exclusively to the game of golf.  Additional uses that help a citizen live in convenient proximity to a golf course are conditional.

**By-Right Uses:**

(1)  Golf course
(2)  Caddies' quarters

**Conditional Uses:**

(1)  Single-family home
(2)  Multiple-family home
(3)  Town house
(4)  Substance-abuse treatment center

No one would suppose that this zone discriminates against recovering substance abusers.  They are identified and deprived the benefit of by-right use, to be sure; but they are placed with similar groups, and separated from dissimilar groups, based on a conventional, neutral distinction between recreational and non-recreational usage.  *See*, *e.g.*, *Wensmann Realty, Inc. v. Eagan*, 734 N.W.2d 623, 628 (Minn. 2007).  A less established or more arbitrary zoning distinction is more likely to divide materially similar groups—more likely, that is, to discriminate.  So if substance-abuse treatment and another use, "though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other" discriminates on its face.  *River of Life Kingdom Ministries v. Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010) (applying RLUIPA's "equal-terms" provision); *Eljah Group, Inc. v. Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011) (same).

10

> According to GBU:
>
> > It is the distinction between "by-right" uses and "conditional" uses [in the B–4 zone] that violates federal law.  In short, the city treats Get Back Up differently based on the composition of Get Back Up's patients—recovering addicts and alcoholics.  As a hospital or a nursing home, it would be allowed to operate.   As a substance abuse facility, it must go through the conditional[-]use permitting process.

(Dkt. # 20 at 23.)  GBU reaches this conclusion, however, by ignoring or blurring the differences among a hospital, a nursing home, and a substance-abuse treatment center:

> > If Get Back Up wanted to call itself a nursing home or a hospital, both of which entail continuing overnight stays (for weeks or months) with medical treatment, Get Back Up would have an absolute right to operate.  Likewise, a hospital that provided treatment for recovering substance abusers would be allowed to operate "by-right."

(*Id.* at 22-23.)  GBU may not "call itself a nursing home or a hospital," because it is not one.  It is not even materially similar.

Start with a hospital.  Detroit's zoning ordinance says that in a residential use, "tenancy is arranged on a monthly or longer basis," and, conversely, that a use is not residential if tenancy is arranged for less than a month.  Sec. 61-16-92.  GBU houses its residents for more than a month.  A hospital stay of a month or more is rare, and almost never "arranged."  GBU is a residential use; a hospital is not.  It is a fundamental premise of zoning law that residential and non-residential uses tend to differ in how, and to what degree, they produce noise, occupy parking, create traffic, generate tax revenue, consume utilities and public services, affect local property value, and impact local employment.  *See Lakewood, Ohio, Congregation of Jehovah's Witnesses, Inc. v. Lakewood*, 699 F.2d 303, 308 (6th Cir. 1983).  And the premise holds in this case; by

11

most of the common measures a hospital differs from GBU as much as GBU differs from a single-family home.

GBU notes that a hospital might run a substance-abuse program, as if that establishes congruity. It does not. A hospital with a substance-abuse center is a hospital; a substance-abuse center with a hospital is . . . a hospital. Not only does a hospital have an exceptional impact on traffic, parking, employment, *etc.*; it has an exceptional impact on public health. Most hospitals "afford[] facilities for surgery and intensive medical care, assist[] in the training of physicians, surgeons and nurses, [remain] subject to . . . complete regulation and control, and in many cases render[ emergency] services without cost to those unable to pay." *Bellings v. Denville Tp. in Morris Cnty.*, 233 A.2d 73, 77 (N.J. Super. Ct. App. Div. 1967). If a typical hospital started a residential substance-abuse program (GBU cites nothing to show if, or how often, this occurs), the benefit of the hospital's many other crucial services would remain the predominate benefit of the institution.

Although a nursing home resembles a substance-abuse treatment center more closely, difference overshadows similarity. The zoning ordinance's definition of "nursing home" reads in part:

> [A nursing home] provide[s] a full range of 24-hour direct medical, nursing, and other health services by registered nurses, licensed practical nurses, and nurses aides prescribed by a resident's physician. [It is] designed for older adults or disabled persons who need health care supervision, but not hospitalization. Emphasis is on nursing care, but restorative therapies may be provided.

12

Sec. 61-16-53.  By definition, a nursing home specializes in treating and caring for the infirm.  A nursing home enjoys the protections of federal discrimination law.  *See*, *e.g.*, *Hovsons, Inc. v. Brick*, 89 F.3d 1096, 1102-03 & n.3 (3d Cir. 1996).

GBU points out that both a substance-abuse treatment center and a nursing home house recipients of medical care; it assumes that the two uses are therefore materially similar.  It never explains why the presence of medical care, any type of medical care, automatically makes two groups materially similar.  No good explanation exists, which is, of course, one reason why a city will never allow the treatment of smallpox wherever it allows the treatment of substance abuse.  In raising only the superficial and general attribute of medical care, GBU neglects a pertinent distinction.  A nursing home provides medical care and houses people of limited mobility, who struggle to walk, who need help bathing and dressing, who, in short, need constant physical assistance.  A substance-abuse treatment center provides medical care and houses people who, notwithstanding their other problems, can physically attend themselves.  One establishment systematically assists the physically disabled; the other does not.  It is no surprise that nursing homes, with their physically-limited residents, often receive special zoning treatment.  *See* 83 Am. Jur. 2d *Zoning & Planning* § 364 (2013).  A city may reasonably encourage nursing homes to operate in a business zone, "within a short distance of essential basic services such as grocery stores and pharmacies." *Perkasie v. Moulton Builders, Inc.*, 850 A.2d 778, 781-82 (Pa. Commw. Ct. 2004).  A city might reasonably allow a nursing home but not other forms of residence in a business zone, on the ground that the city desperately needs nursing care, *see* 3 Patricia E. Salkin, American Law of Zoning § 18:61 (5th ed. 2013), or on the ground that

13

a nursing home is uniquely sedate and unburdensome.[4]   The physical incapability of

most nursing-home residents renders a nursing home materially different from a

substance-abuse treatment center.

A slightly different approach finds the same conclusion.  Suppose that each man

at GBU had never in his life consumed drugs or alcohol.  GBU would be an ordinary

rooming house, and, under the zoning ordinance, it would need a conditional-use

permit.  The ordinance permits as a conditional use in a B–4 zone both a substance-

abuse treatment center and each unremarkable arrangement of group living ("rooming

house," "fraternity," "multiple-family dwelling," and so on).  Federal discrimination law

typically ensures only that a disabled person is treated, when reasonably possible, like a

person free of disability.  *See Cinnamon Hills Youth Crisis Ctr. v. Saint George*, 685

F.3d 917, 923-24 (10th Cir. 2012) (FHA); *Forest City Daly Housing*, 175 F.3d at 151-52

(same); *Hemisphere Building Co., Inc. v. Richton Park*, 171 F.3d 437, 440-41 (7th Cir.

1999) (same); *Traynor v. Turnage*, 485 U.S. 535, 549 (1988) (Rehabilitation Act);

*Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997) (same); *but cf. Olmstead v. L.C.*

*ex rel. Zimring*, 527 U.S. 581 (1999) (ADA) (isolating a disabled person in an institution

can constitute *per se* discrimination).  GBU cites no authority for the notion that its

residents must receive special treatment, or the treatment of a dissimilar disabled

group.  Nor does GBU argue that the ordinance discriminates on its face by providing

GBU residents no reasonable accommodation.  (Dkt. # 24 at 2 n.1.)  GBU says Detroit

---

[4] Attempting to identify a nursing home's negative bearings, one zoning treatise does no better than: disoriented residents "wandering from [the] premises," "odors and noise," and the possibility that the residents' "appearance . . . is not invariably cheering." 2 Norman Williams, American Land Planning Law § C.60.IV (2012).

must treat disability and its absence as one.  (Dkt. # 20 at 23.)  The presumption

remains, then, that the ordinance, which treats GBU like a standard rooming house,

does not discriminate on its face.

    Toward GBU, the ordinance is neutral.

### 2.  Detroit's Application of the Zoning Ordinance

    Because the zoning ordinance is neutral and direct evidence of discrimination is

absent, the shifting burdens of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), govern GBU's challenge to the BZA's decision.  *Smith & Lee Assocs., Inc. v.*

*Taylor*, 102 F.3d 781, 790-91 (6th Cir. 1996) (FHA); *Turner v. Englewood*, 195 F. App'x

346, 353-54 (6th Cir. 2006) (ADA and Rehabilitation Act) (applying *Smith & Lee*

*Associates*); *see also*, *e.g.*, *Cinnamon Hills*, 685 F.3d at 919.  The analysis begins, and,

in this instance, will end, with a search for evidence that the BZA denied GBU a

conditional-use permit at least in part from hostility toward the disabled.  102 F.3d at

790.  GBU's evidence of hostility is also, by sustained repetition, the main theme of

GBU's papers—that the BZA based its decision on "myths and stereotypes" about

recovering substance abusers.  The best way to test this claim is to consider the

evidence presented at the December 8, 2009, BZA hearing and the zoning ordinance's

command that a special use neither diminish public safety nor "injur[e] . . . the use and

enjoyment of [nearby] property."

    GBU informed the BZA that, according to "studies," a substance-abuse treatment

center neither attracts nor emits crime.  Whether these "studies" applied regression

analysis, or compared centers with and without violent offenders, or compared centers

with and without residents present by court order, GBU did not say.  Moreover, no

15

"study" appears in the record before the district court; only a brief advocacy paper, which states, based on nothing, that a rehabilitation center "pose[s] no legitimate danger" to a neighborhood.  (Dkt. # 10, Ex. T.)

Although GBU thus told the BZA nothing useful about substance-abuse centers in general, the BZA learned a lot about GBU in particular.  Guests are searched for metal, which suggests a concern about weapons and violence.  Some of the residents—a portion GBU did not specify—need therapy to manage anger or to address acts of domestic violence.  A resident can (and, after the hearing, often did) come by force of court order, perhaps—only GBU knows—without regard to his record of violence.  And yet, despite these signs of violent tendency, a resident—any resident?—may, after only a few weeks, leave the building and step unsupervised into the immediate residential neighborhood.  In addition to these revelations—and omissions—about GBU policy, the BZA heard allegations of specific misbehavior; that GBU residents solicit work from porch-sitters, persecute dog-walkers, and steal from the local drugstore.  These middling indignities arose when the facility was less than a fifth full; the BZA had reason to contemplate whether they foreshadowed increasing vexation for the neighborhood in the event that GBU continued to grow.  And GBU's counsel never addressed the public's allegations; in a plausible sign of his client's future approach to community relations, counsel dismissed public concern as irrational.  The BZA could reasonably decide that GBU, which appears open to violent men, which allows unsupervised leave, which fails to constrain indecent conduct, and which appears closed to complaint, may not operate next to single-family homes.  The most logical and parsimonious understanding of the BZA's decision therefore stands entirely

16

on distinct facts about GBU, none of which attach inherently to substance-abuse recovery.  Reference to general facts (or "myths") about substance-abuse recovery is superfluous.

No persuasive counterpoint appears.  GBU notes that the BZA considered hearsay; but a zoning board need not maintain strict rules of evidence.  83 Am. Jur. 2d *Zoning & Planning* § 710 (2013); 3 Rathkopf's Law of Zoning & Planning § 57:60 (4th ed.).  GBU says it is "of critical importance" that problems were not "brought . . . to GBU's attention" before the hearing and that GBU has never "knowingly allowed [unruly] behavior to continue."  (Dkts. ## 20 at 15, 22 at 5.)  But nothing prevented the BZA from concluding that GBU not only had not, but would not, control its residents.  GBU claims that scornful public comments during the hearing tainted the BZA's decision.  But GBU identifies no overtly discriminatory remark; at worst, a few statements, such as "People [in the area] are nervous," qualify as vague and unhelpful; nothing indicates that the hearing's less cogent speakers influenced the BZA's decision.  Similarly, nothing suggests that the "difficult and contentious" hearing before the lower zoning board—where GBU prevailed—influenced later proceedings.  (The difficulty at that hearing, although condemnable, did not excuse GBU from appearing before the BZA.  *See United States v. Palatine*, 37 F.3d 1230, 1234 (7th Cir. 1994).)

GBU's discrimination claim stands on the assertion that the BZA lacked a sound reason to deny GBU a conditional-use permit.  Because there were sound reasons to deny GBU a permit, reasons that had nothing to do with hostility against the disabled, the claim under federal discrimination law fails.

17

### B.  The Fourteenth Amendment (Void for Vagueness)

The due process clause voids an overly vague law—a law that contains no standard of conduct or that authorizes arbitrary enforcement.  *600 Marshall Entm't Concepts, LLC v. Memphis*, 705 F.3d 576, 586 (6th Cir. 2013); *Chambers v. Stengel*, 256 F.3d 397, 400 (6th Cir. 2001).  A zoning ordinance is void for vagueness if "it [is] so vague as to be no rule or standard at all."  *CMR D.N. Corp. v. Philadelphia*, 703 F.3d 612, 631-32 (3d Cir. 2013) (quotation omitted); *see also Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001); *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992).

GBU raises a broad (one might say "vague") void-for-vagueness claim; it challenges each of the fifteen conditional-use criteria in Section 61-3-231 of the zoning ordinance.  It provides no independent analysis; it merely invokes the authority of two cases, *H.D.V.-Greektown, LLC v. Detroit*, 06-cv-11282, 2007 WL 2261418 (E.D. Mich 2007), and *Osius v. St. Clair Shores*, 75 N.W.2d 25 (Mich. 1956).

Citing *Greektown*, GBU proclaims that a judge "in this district has already . . . specifically held that Section 61-3-231 is . . . impermissibly vague."  (Dkt. # 20 at 31.) *Greektown* indeed states that Section 61-3-231 "impermissibly" gives Detroit "broad discretion"; but GBU neglects context.  *Greektown* addresses whether Section 61-3-231, if applied to expressive conduct, constitutes a prior restraint on speech—"the most serious and the least tolerable infringement on First Amendment rights."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  As a prior restraint, an ordinance must provide "narrow, objective, and definite standards."  *Ark. Educ. Television Com'n v. Forbes*, 523 U.S. 666, 691 (1998).  As an ordinary zoning regulation, an ordinance

18

needs merely to avoid providing "no standard at all."  The resemblance between *Greektown* and this action is spurious.

Recall that Section 61-3-231 requires a conditional use "to be operated so that the public health, safety, and welfare will be protected."  GBU plucks from *Osius* an assertion, *obiter dictum*, that "broad statements as to the public health, safety, and general welfare . . . afford no sufficient guide for [a zoning] board in the exercise of its discretion."  75 N.W.2d at 28.  GBU adopts the assertion as a legal standard, and applies it to Section 61-3-231.  It is an odd maneuver.  GBU establishes neither that *Osius* applied the federal Constitution,[5] nor that, since 1956, anyone has applied *Osius*'s "rule."  It turns out that the decision has not aged gracefully.  In *Florka v. Detroit*, 120 N.W.2d 797 (Mich. 1963), for example, the plaintiffs challenged a zoning ordinance that permitted a special use "subject to the approval of the [zoning] commission as being not injurious to the surrounding neighborhood and not contrary to the spirit and purpose of the [zoning] ordinance."  *Florka* held that the standard, "not injurious to the surrounding neighborhood," provided "sufficient guidance" to the zoning commission. 120 N.W.2d at 803.  It distinguished *Osius* as a decision "based on the failure to prescribe any standards whatever."  *Id.  Osius* has been repeatedly narrowed to its facts.  *See Westervelt v. Nat. Res. Comm'n*, 263 N.W.2d 564, 574 (Mich. 1978) (noting both that in *Osius* "there were no standards whatsoever in the ordinance at issue" and that, since *Osius*, "a flexible, adaptable rule regarding 'standards'" has developed);

_____

[5] GBU raises no claim under the Michigan Constitution.  Although at one point GBU says that Detroit "violate[d] the state and federal constitutions," (Dkt. # 20 at 32), that statement reveals a habit of drift in GBU's papers; not a developed argument under state law.

*Dykstra v. Dir., Dept. of Nat. Res.*, 499 N.W.2d 367, 372 (Mich. Ct. App. 1993)

(distinguishing *Osius* because it "involve[d a] constitutional challenge[] in [a] situation[]

where there [was] literally no standard[] provided"); *Mobil Oil Corp. v. Clawson*, 193

N.W.2d 346, 349 (Mich. Ct. App. 1972) (distinguishing *Osius* because "the zoning board

of appeals in that case was not provided with any standards whatsoever").

      For better or worse, states have acquired, and passed to cities, an expansive

power to zone in accord with "the public interest":

> One of the fundamental but essentially unstated principles in the American
> constitution is that each state government possesses certain inherent powers
> enabling it to govern and keep order.  Most of these powers fall under the
> heading of police power, which has come to mean the state's power to
> maintain the public health, safety, morals and general welfare.  Generally,
> this means that reasonable restrictions can be placed on the use of private
> property, and that the reasonableness of restrictions is a fluid concept,
> especially with recent expansions of the notion of public welfare as a
> justification for broader restrictions.

8 Thompson on Real Property § 74.02(b) (2005).  Detroit's use in its zoning ordinance

of general terms such as "public welfare" and "enjoyment of property" is by no means

unusual.  *See*, *e.g.*, *Shepherd Montessori Ctr. Milan v. Ann Arbor*, 675 N.W.2d 271,

286-88 (Mich. Ct. App. 2003) (rejecting a void-for-vagueness challenge to the zoning

standard, "as will not be contrary to the public interest"); *Kruse v. Castle Rock*, 192 P.3d

591, 598-600 (Colo. App. 2008) (same—"diminish the character and sense of place in

the community"); *Campion v. Bd. of Aldermen of City of New Haven*, 899 A.2d 542, 558-

59 (Conn. 2006) (same—"so designed . . . as to produce an environment of stable and

desirable character").  In this context, and in the absence of an argument from GBU,

Section 61-3-231 must stand.  The section provides general standards, which are more

than "no rule or standard at all."  *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982).

In any event, because GBU does not argue that the zoning ordinance infringes a First Amendment right, GBU may challenge the ordinance only as applied, *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); and an as-applied challenge fails.  If nothing else, harassing someone as she walks her neighborhood injures her enjoyment of her property.  GBU may not challenge as vague an ordinance it did not fulfill.  *See Hoffman Estates*, 455 U.S. at 494-95 & n.7.

The zoning ordinance is not vague.

## IV.  CONCLUSION

The record contains letters from Get Back Up residents, and their relatives, describing how Get Back Up has served them.  These solemn documents affirm that Get Back Up helps men to stay sober, to think positively, to set goals, to become accountable—to "turn their lives around."  Get Back Up does noble work.  Addicts and their families lose if it closes.  Detroit loses.

The issue in this action, however, is not where Get Back Up may operate; nor even whether it may operate where it does; but *who decides.*  Zoning is a local affair, and a federal court is not a supreme zoning board.  The zoning rule at issue in this action advantages the peace and safety of established homes and businesses, and disadvantages equally a diverse group of potential newcomers.  The zoning decision at issue applied this rigid but neutral rule.  Defending the decision, Detroit presents the evidence it heard that Get Back Up disrupts the local peace and diminishes local safety.

21

Challenging the decision as biased, Get Back Up provides only surmise and speculation.  The decision neither disfavored the disabled nor denied due process.

IT IS ORDERED that Detroit's motion for judgment [Dkt. # 21] is GRANTED and that Get Back Up's motion for judgment [Dkt. # 20] is DENIED.  A judgment will issue in accord with this order on **July 16, 2013**, unless, before that day, the parties stipulate to, or Get Back Up moves for, a stay pending appeal.


 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 1, 2013


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 1, 2013, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522